UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

CASE NO: 5:11-cv-00551

SHAMEKA BANKS, individually and as parent to
TIMOTHY BANKS and JEREMIAH BANKS,
and GREATER NEW ORLEANS
FAIR HOUSING ACTION CENTER

       Plaintiff,

v.

HOUSING AUTHORITY OF THE CITY OF BOSSIER CITY,
LOUISIANA.

       Defendant.

## COMPLAINT
(DEMAND FOR JURY TRIAL)

COMES NOW, the Plaintiffs, SHAMEKA BANKS, individually, and as parent to TIMOTHY BANKS and JEREMIAH BANKS, and the GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, by and through their undersigned counsel, and hereby sues the Defendant, HOUSING AUTHORITY OF THE CITY OF BOSSIER CITY, LOUISIANA and in support of this cause of action, states the following:

PARTIES

    1.    The GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, ("FHAC") is a private, non-profit civil rights organization established in the summer of 1995 to eradicate housing discrimination throughout the greater New Orleans area, through education, investigation, and enforcement activities. FHAC is dedicated to fighting housing discrimination not only because it is illegal, but also because it is a divisive force that perpetuates poverty, segregation, ignorance, fear, and hatred. FHAC

enforcement staff investigates complaints of discrimination and conducts regular audits of housing markets in order to understand discriminatory trends and advocate against them. Since Katrina, FHAC has produced three systemic audits of housing discrimination based on race, disability, and source of income. FHAC has negotiated numerous consent decrees requiring housing providers to comply with fair housing laws, attend educational seminars, market their properties to protected classes, and engage in other proactive measures to ensure that housing opportunities are provided on an equal basis. FHAC staff teaches over a thousand people every year about their fair housing rights and obligations through first time homebuyer classes, the annual Fit For a King conference, and talks with students, neighborhood associations, local officials, housing providers, and volunteers.

2. SHAMEKA BANKS ("Ms. Banks") is a resident of Bossier Parrish and is otherwise *sui juris*.

3. TIMOTHY BANKS ("TIMOTHY") is a minor resident of Bossier Parrish, the son of Ms. Banks.

4. JEREMIAH BANKS ("JEREMIAH") is a minor resident of Bossier Parrish, the son of Ms. Banks.

5. The Housing Authority of the City of Bossier City, Louisiana (the "HOUSING AUTHORITY") was charted as a public corporation for the purpose of providing safe and sanitary housing, as authorized by Louisiana Revised Statute 40:391. The HOUSING AUTHORITY is governed by a five-member board of commissioners, who are appointed by the Honorable Mayor of the City of Bossier City, Louisiana.

6. The HOUSING AUTHORITY owns and operates property commonly known as Hall Park, a public housing development, located at 1313 Carver Street, Bossier City, LA 71111.

7. The Court has original jurisdiction pursuant to 11 U.S.C. § 1331, 42 U.S.C. § 3613, because this lawsuit is brought under the Fair Housing Act, 42 U.S.C. § 3601 et seq.

8. Venue is proper in the Western District of Louisiana, under 28 U.S.C. § 1391(b), because the claim arose in this judicial district.

**FACTS AS TO SHAMEKA BANKS**

9. Ms. Banks is a 31-year old single mother of three children: Timothy Johnson, 16-year-old boy, Jeremiah Banks, 11-year-old boy, and Carol Elizabeth Johnson, a 7-year-old girl.

10. On or about February 2008, Ms. Banks and her children moved into a unit at 1313 Carver Street in Hall Park, a distinct section of the HOUSING AUTHORITY.

11. In November 2008, Ms. Banks requested maintenance assistance to repair her kitchen sink.

12. Danny Smith, a maintenance man employed by the HOUSING AUTHORITY was directed by the HOUSING AUTHORITY to respond to Ms. Banks' request.

13. When Danny Smith finished the work, he dried his hands on Ms. Banks' shirt, fondling her breasts and sexually assaulting her.

14. Ms. Banks told Danny not to do that again, and if he did, she would report him.

15. Danny Smith made remarks that insinuated that Ms. Banks saying anything to Defendant HOUSING AUTHORITY would be futile.

16. On March 27, 2009, Ms. Banks called the office of Hall Park for a light bulb change since it was not a typical light fixture, and Ms. Banks did not want to damage it. Danny Smith was sent to her unit to do the work.

17. Danny Smith complained that they only change light bulbs for the elderly, and he called Ms. Banks a "lazy ass." After he changed the bulb, he proceeded to assault Ms. Banks again by grabbing her buttocks. Ms. Banks told him that she was going to report him. Danny Smith laughed and left the unit.

18. Danny Smith also made comments to her and other female residents asking: "Where are you going to go?"

19. The abovementioned assault occurred on a Friday. Ms. Banks attempted to report the incident to Dorothy Stroud, the manager at Hall Park and a HOUSING AUTHORITY employee. Ms. Stroud was unavailable.

20. For immediate relief, Ms. Banks reported the incident to the Bossier City Police Department that weekend to report the assault.

21. A Protective Order was issued and served on or about Tuesday, March 31, 2009 and was eventually made permanent.

22. On Monday, March 30, 2009, Ms. Banks called Ms. Stroud to report the incident, however Ms. Stroud was unavailable to meet. On Tuesday, March 31, 2009, Ms. Banks went to see Dorothy Stroud, the manager of Hall Park, who advised her to file a complaint about Danny Smith with Defendant HOUSING AUTHORITY. However, Ms. Stroud stated a complaint could not be made until the next day. Ms. Banks was not

advised of the HOUSING AUTHORITY sexual harassment or statutorily mandated Violence Against Women Act Procedures.

23. In her March 31, 2009 conversation with Ms. Stroud, Ms. Banks also requested to speak with HOUSING AUTHORITY executives, Mr. Billie Hensley and Mr. William McDonald, but was told she had to request a meeting in writing.

24. Ms. Banks submitted to Defendant HOUSING AUTHORITY a written complaint of sexual harassment against Danny Smith that was received by them on March 31, 2009. Her stepfather accompanied her to submit the request. Ms. Banks made a request to speak with HOUSING AUTHORITY Executive Director Billie Hensley about this situation. This written request was denied in violation of the HOUSING AUTHORITY policy.

25. Ms. Banks and her stepfather were fearful of the safety of Ms. Banks and her children, knowing that Danny Smith had a key to her apartment. As a result they requested of Ms. Stroud that the locks on the doors and windows of her unit be changed. A later request to change locks on the door was made to Mr. Hensley. Both requests to change the locks were denied.

26. Three to four hours after submitting the complaint to Defendant HOUSING AUTHORITY, Defendant HOUSING AUTHORITY sent Danny Smith to repair the windows of Ms. Banks' unit. Danny Smith arrived, calling Ms. Banks obscenities. Ms. Banks refused to open the door, and he left cursing.

27. Days later, Ms. Banks was walking home from the Recreation Center near Hall Park, and Danny Smith was driving nearby and yelled obscenities at her.

28. Nearly a week after the issuance of the TRO, Ms. Banks was finally allowed to meet with HOUSING AUTHORITY Executives Billie Hensley and William McDonald.

29. Ms. Banks expressed her fear for her safety and the safety of her children.

30. On April 3, 2009, due to the restraining order, Danny Smith was prohibited from going to "Hall Park," the area of the complex where Ms. Banks lived, and was confined to work on the "Scott Street" side of the complex. "Hall Park" only had one entrance and exit, so the only way to respect the TRO was to keep Danny Smith out of "Hall Park."

31. Since April 2009, through the present date, Ms. Banks felt nervous and scared because she believed Danny Smith could access her unit. She purchased an extra lock and security bar for her front door. Ms. Banks had barricades constructed for her back door, and the barricades remain there since the HOUSING AUTHORITY has, to the present date, refused to change Ms. Banks locks.

32. Ms. Banks even moved her children to her parents' house for a few months for their safety and because they were emotionally affected by fear of further harassment.

33. Shortly after the TRO was issued, someone came to the rear of Ms. Banks' apartment and banged loudly on the back window, shouting: "I know you're in there." At the time, Ms. Banks' son Timothy was home alone. Timothy, afraid, ran out of the house in time to see the man walk away. Several days later, when walking on the Housing Authority complex with Ms. Banks, Timothy saw the man who had banged on the back window, and Ms. Banks identified the man as Mr. Fox, a maintenance employee

of the HOUSING AUTHORITY and a friend of Danny Smith's. Ms. Banks, fearful as a result of the interaction, subsequently informed the HOUSING AUTHORITY of harassment and requested that the HOUSING AUTHORITY restrict Mr. Fox from visiting her unit in the future. The HOUSING AUTHORITY, however, refused the request.

34. In September 2010, Danny Smith was driving in "Hall Park." When he saw Ms. Banks at an intersection, he blocked her car with his work truck and began to glare at her threateningly for a few minutes before driving off. As a result, the other maintenance man present asked to leave, stating he didn't want to be a part of anything. Ms. Banks immediately reported the incident to the police. Danny Smith's actions violated the TRO. Subsequently, he was fired and arrested.

35. Though Ms. Banks again asked for the locks to be changed, the HOUSING AUTHORITY again refused. Danny Smith previously maintained a key to Ms. Banks apartment and could enter at any time.

36. When taking the actions alleged in Paragraphs 11-35, Danny Smith was acting within the scope of his authority as maintenance personnel at Hall Park on behalf of the HOUSING AUTHORITY.

37. Ms. Banks continued to fear for the safety of her family and herself. As a result of this unlawful discrimination, Ms. Banks has suffered injury, damages, fear of homelessness, mental anguish, grievous emotional distress, embarrassment, shame, worry, frustration, and humiliation. These losses are either permanent or continuing and Plaintiffs will suffer these losses in the future.

38. Stemming from the trauma inflicted on Ms. Banks by Danny Smith, Ms. Banks was selected, due to the severity of her case, by the Sheriff Victim's Assistance Program to see a therapist, Ms. Shawna Gilbert. Ms. Gilbert asserts that Ms. Banks has experienced severe emotional and physical symptoms from the encounters with Danny Smith. Ms. Gilbert states that Ms. Banks suffers from medical insomnia, feelings of hopelessness, crying spells, chronic fatigue, and hair loss, and had to take pain medication for boils. Ms. Gilbert required Ms. Banks to keep a sleep journal that documents her inability to sleep out of fear for her and her children's safety. At the present time, Ms. Gilbert recommends that Ms. Banks no longer be enrolled in school or pursue working due to her emotional state and inability to sleep through the night.

39. Ms. Gilbert additionally detailed the ongoing emotional stress faced by Ms. Banks' sons, who she forbids to play outside, for fear of Danny Smith. Ms. Banks has built barricades for both her front and rear doors, which she continues to use to this day. Shortly after the incident, Ms. Banks sent her kids to stay with her parents for their safety.

40. On May 4, 2009, Ms. Banks filed a complaint with the U.S. Department of Housing and Urban Development, alleging that she was injured by a discriminatory act based on sex. The complaint was then referred to the Louisiana Department of Justice, to conduct an investigation to determine whether there is reasonable cause to believe that discrimination took place.

41. On June 16, 2010, the Louisiana Department of Justice issued a determination that Defendant HOUSING AUTHORITY was aware that their employee was sexually harassing the female tenants. It was further determined that the evidence

supported Ms. Banks' allegation that she has been subjected to sexual harassment and that she was discriminated against on the basis of sex.

42. Since filing her fair housing complaint, Ms. Banks' relationship with the HOUSING AUTHORITY has been further strained, as they have engaged in retaliatory behavior.

43. Ms. Banks is still living at Hall Park, the property owned by the HOUSING AUTHORITY.

44. On March 24, 2011, Ms. Banks requested repairs be made to her sink.

45. Hall Park Manager Dorothy Stroud sent maintenance men to the unit who were unable to be repair the sink. As a result, Ms. Banks requested that an outside company repair the sink. Ms. Stroud sent an outside repair company to fix the sink.

46. The outside repair company caused significant damage to the wall when repairing the sink. Ms. Banks contacted Hall Park Manager Stroud to inform her of the remaining damage.

47. Stroud stated, "That wasn't Housing Authority's problem. If you want to sue someone this time sue the right person."

48. Stroud indicated that Ms. Banks should send her children away or Ms. Banks could face a claim of child neglect. She also told her that it was not the HOUSING AUTHORITY's responsibility to fix the hole.

**FACTS AS TO TIMOTHY BANKS**

49. TIMOTHY was a high school sophomore when he discovered the harassment his mother was suffering as a result of the HOUSING AUTHORITY'S actions.

50. TIMOTHY, a high school wrestler and football player, found himself alternating through periods of sadness and anger. This was illustrated through crying and punching things such as walls.

51. During this time TIMOTHY observed his mother becoming more stressed and aggravated, which would make him upset and sad. He and his mother would get into arguments at the time.

52. Since TIMOTHY was the oldest male child, he felt the need to protect his mother. He experienced fear and remembers vividly the housing being barricaded to protect them.

**FACTS AS TO JEREMIAH BANKS**

53. JEREMIAH is the middle child in the Banks family.

54. During the sexual harassment of his mother, he was aware of everything happening because he overheard conversations about the harassment and watched his mother's hair loss and weight loss.

55. JEREMIAH was forced to live with his grandmother due to his mother's fear for his safety. He longed to live with this mother.

56. As a result of the emotional upheaval, JEREMIAH began failing math and reading, crucial skills for his age and his favorite subjects at the time.

57. JEREMIAH was also involved in fights due to his anger and powerlessness about the fear his family was experiencing. He acted out and confided in a principal the cause of his fights was the turmoil his family was experiencing.

58. JEREMIAH still experiences stomachaches and sleeplessness as a result of the HOUSING AUTHORITY'S actions.

**FACTS AS TO GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER**

59. FHAC was referred this complaint by the Louisiana Department of Justice (LADOJ), following a full investigation and a LADOJ determination that there is reasonable cause to believe that discrimination took place.

60. The LADOJ contacted FHAC because it is the only non-profit in the State of Louisiana that offers free fair housing enforcement services. If FHAC did not accept this referral, given Ms. Banks' limited resources, Ms. Banks would have had significant difficulty in finding legal assistance for this matter.

61. Due to the fact that Ms. Banks did not have other means for enforcing her rights, and in light of the severity of the offense, FHAC was compelled to dedicating investigative resources to enforcing this matter, and to dedicating outreach and education resources to redressing this offence. FHAC regarded this case as egregious because the Louisiana Department of Justice issued a determination that there is reasonable cause to believe that discrimination took place, there is evidence of a pattern and practice of discriminatory behavior, the defendant is a Public Housing Authority, and the case involves sexual harassment of a vulnerable tenant in subsidized housing.

62. In the course of investigating this matter, FHAC staff made three trips to the Bossier City region. In these trips, FHAC staff interviewed Ms. Banks, her family members and the other witnesses, canvassed the public housing complex, researched court records, issued public records requests, and spoke with Housing Authority staff. To counteract effects of the discrimination, FHAC outreach staff developed an outreach flier on sexual harassment in the housing context that was distributed to residents in the Bossier City area.

63. In the course of dedicating staff time and resources to this case, FHAC diverted its scarce resources away from other enforcement and outreach activities, including the following: research on issues related to limited English proficiency services among publicly funded housing providers; filing suit against a landlord in New Orleans that discriminated on the basis of race; investigating compliance with accessibility requirements in new multifamily housing developments; and developing a fair housing workshop for children in the region.

**FACTS AS TO HOUSING AUTHORITY**

64. The HOUSING AUTHORITY had actual knowledge or should have known that Danny Smith was sexually harassing female residents of the public housing development.

65. In August 2007, Danny Smith sexually harassed a pregnant female tenant during Kids Day in the park. She personally informed Defendant HOUSING AUTHORITY President, Billie Hensley, about the sexual harassment. He advised her to go to the office and make a report. She submitted the report, but to her knowledge, no action was taken.

66. Another female tenant had problems with Danny Smith since the 1990s. Danny Smith touched her breasts and tried to touch her between her legs. He also offered her money in exchange for sex.

67. Danny Smith asked a third female tenant how much it would cost to go to bed with her. When she would complain, Danny Smith advised her: "Who are you going to tell, you don't have anywhere to go, and nobody's going to believe you anyway." This witness was afraid of losing her apartment and never said anything.

68. To a fourth female tenant, Danny Smith always asked for sex when he entered her unit to do repairs. He also would tell her that if she let him feel her, her repairs would be done more quickly.

69. The actions alleged in Paragraphs 65-68 were described in the Louisiana Department of Justice Cause Determination and Final Investigative Report.

70. On belief and information, the Defendant HOUSING AUTHORITY continued its recklessness in hiring employees as demonstrated by its hiring a security guard who had been dismissed from the Bossier Parish Sherriff Department for sexual misconduct with a female inmate at the detention center.

71. Defendant's actions were in total and reckless disregard of Ms. Banks and all of its female residents' rights.

72. The Defendant HOUSING AUTHORITY has failed to comply with HUD regulations by abiding with the Violence Against Women Act because the HOUSING AUTHORITY failed to have procedures to process sexual assault complaints, failed to amend their administrative plan to include these procedures, and failed to notify residents of their protections under the Act, in their leases or otherwise.

73. On June 16, 2010, a determination was made by the Louisiana Department of Justice that Bossier City Housing Authority was aware that Danny Smith was sexually harassing the female tenants. It was further determined that the evidence supported Ms. Banks' allegation that she has been subjected to sexual harassment and discriminated against on the basis of sex.

74. The described discriminatory actions undertaken by Defendant HOUSING AUTHORITY have injured FHAC by (a) interfering with the efforts and programs of

FHAC, which were intended to bring about equality of opportunity in housing; (b) forced FHAC to devote scarce resources to identify and counteract defendant's unlawful housing practices; and (c) interfered with the rights of FHAC constituents in Louisiana from enjoying the benefits of living in an integrated and safe community, thereby frustrating FHAC's mission and purpose.

75. Plaintiffs have retained the undersigned firms to represent them in this cause and have agreed to pay them a reasonable fee for their services.

## CAUSE OF ACTION

76. Defendant have violated the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, by discriminating against persons on the basis of sex in connection with the rental of an apartment in Defendant's premises

77. Since at least the late 1990s, and possible earlier, through the present, Defendant has subjected numerous female tenants living in its property to severe unwelcome and pervasive sexual harassment, thereby creating a hostile environment for female tenants and/or amounting to quid pro quo harassment. Such conduct includes, but limited to:

   a. unwanted verbal sexual advances, such as repeatedly soliciting sexual favors in exchange for more expedited maintenance services;

   b. unwanted sexual touching, such as grabbing tenants inappropriately;

   c. conditioning the terms, conditions, and privileges of women's tenancy on the granting of sexual favors;

    d. granting and denying tangible housing benefits based on sex; and

    e. taking adverse action against female tenants when they refused or objected to Danny Smith's sexual advances.

78. Defendant HOUSING AUTHORITY is liable for the discriminatory conduct of its agent, Danny Smith. Defendant HOUSING AUTHORITY knew or should have known of the discriminatory conduct of Danny Smith, yet failed to take reasonable corrective measures.

79. The Defendant HOUSING AUTHORITY's conduct described herein constitutes:

    a. A denial of housing or making housing unavailable because of sex, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

    b. Discrimination in the terms, conditions, or privileges of the rental of dwellings, or in the provision of services or facilities in connection therewith because of sex, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b);

    c. The making of statements with respect to the rental of dwellings that indicate a preference, limitation, or discrimination based on sex, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c); and

    d. Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged another

person in the exercise or enjoyment of, their rights under Section 804 of the Fair Housing Act, in violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617.

80. The Defendant HOUSING AUTHORITY's conduct described above constitutes a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*

81. The Defendant HOUSING AUTHORITY's conduct described above constitutes a violation of the dictates of the Violence Against Women Act, 42 U.S.C. § 13981, *et. seq.*

82. FHAC is an aggrieved person as defined in 42 U.S.C. § 3602(i), and has been injured by the Defendant HOUSING AUTHORITY's discriminatory conduct, and has suffered damages as a result.

83. The Defendant HOUSING AUTHORITY's conduct was intentional, willful, and/or taken in reckless disregard for the rights of others.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, SHAMEKA BANKS, individually, and as parent of TIMOTHY BANKS and JEREMIAH BANKS, respectfully request judgment against the Defendant HOUSING AUTHORITY OF THE CITY OF BOSSIER CITY, LOUISIANA as follows:

 A. Declares that the Defendant's discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 *et seq.*;

B. Enjoins the Defendant, its agents, employees, and successors, and all other persons in the active concert or participation with them from:

   i. Discriminating on account of sex, including by engaging in sexual harassment, against any person in any aspect of the rental of a dwelling;

   ii. Interfering with or threatening to take any action against any person in the exercise or enjoyment of rights granted or protected by the Fair Housing Act, as amended; and

   iii. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of the Defendant's past unlawful practices to the position they would have been in but for the discriminatory conduct;

C. Requires appropriate changes in policy and monitoring in order to ensure compliance with the mandates of the Violence Against Women Act.

D. Awarding such damages to Plaintiff GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER as will fully compensate it for the diversion of resources and frustration of mission caused by the Defendant's unlawful practices.

E. Awarding such compensatory damages to Plaintiff SHAMIKA BANKS, individually and as parent of TIMOTHY BANKS and JEREMIAH BANKS

F. Awarding Plaintiffs reasonable attorneys' fees, costs and expenses incurred in prosecuting this action; and

  G.  Granting Plaintiffs such other further relief as may be just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

  Respectfully submitted on this ___ day of April, 2011.

        LAW OFFICES OF MATTHEW W. DIETZ, P.L.
        2990 Southwest 35th Avenue
        Miami, Florida 33133
        Tel: (305) 669-2822
        Fax: (305) 442-4181
        Email: MatthewDietz@USDisabilityLaw.com

        By: __s/_Matthew Dietz____
          Matthew W. Dietz, Esq.
          Florida Bar No.: 0084905

        GREATER NEW ORLEANS FAIR HOUSING
        ACTION CENTER
        404 South Jefferson Davis Parkway
        New Orleans, Louisiana 70119
        Tel: (504) 208-5070
        Fax: (504) 708-2476
        Email: mwilliams@gnofairhousing.org

        By: __s/_Morgan W. Williams____
          Morgan W. Williams, Esq.
          Louisiana Bar No.: 31564

        LAW OFFICE OF BRADLEY E. BLACK
        Limited Liability Company
        Post Office Box 3884
        Lafayette, Louisiana 70502-3525
        Tel: (337) 680-9662
        Fax: (337) 232-2375
        Email: bradley@bradleyblacklaw.com

        By: __s/_Bradley Black_____
          Bradley E. Black, Esq.
          Louisiana Bar No.: 29763